# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF SOUTH CAROLINA

Donald L. Hollabaugh,              )   CIVIL ACTION NO. 9:14-1324-BHH-BM

                      )

          Plaintiff,           )

                      )

v.                          )

                      )   **REPORT AND RECOMMENDATION**

Leroy Cartledge, Warden; Scott Lewis,  )

Associate Warden of Operations; Officers )

John Doe and Officers Jane Doe,    )

                      )

         Defendants.       )

_____)

        This action was filed by the Plaintiff, an inmate with the South Carolina Department of Corrections (SCDC), asserting violations of his constitutional rights by various Defendants. Plaintiff asserts claims against the Defendants for failure to protect (First Cause of Action), and violation of his right to "substantive due process" under the Fourteenth Amendment (Second Cause of Action). See generally, Amended Complaint.

        Originally named Defendant Robert Ward filed a motion for summary judgment pursuant to Rule 56, Fed.R.Civ.P. on November 10, 2015. The remaining Defendants thereafter filed their own motion for summary judgment on December 16, 2015. Plaintiff also filed a motion for summary judgment on December 21, 2015. Following the filing of these motions, a stipulation of dismissal with prejudice was entered on January 12, 2016 with respect to the originally named Defendants, Byers, Ward, Aiken and Harris.

        As a result of the stipulation of dismissal, the Defendant Ward's separately filed motion for summary judgment is moot. Plaintiff filed a memorandum in opposition to the remaining



1

Defendants'[1] motion for summary judgment on January 14, 2016, and the remaining Defendants filed a response in opposition to Plaintiff's motion for summary judgment on January 15, 2016. Defendants filed a reply to Plaintiff's memorandum in opposition to summary judgment on January 25, 2016.

These motions are now before the Court for disposition.[2]

### Background and Evidence

Plaintiff alleges in his Amended Complaint that during the time period relevant to his claims he was an inmate at the McCormick Correctional Institution(MCI). The Defendant Cartledge is alleged to be the Warden at MCI, while the Defendant Lewis is alleged to be the Associate Warden of Operations at MCI. Plaintiff alleges that prior to August 2007, inmates were given cell door keys with which to open their cells during normal operations. Cell doors were otherwise to remain closed at all times, with the lock in the door locking automatically upon closing the door. However, Plaintiff alleges that in August 2007 the cell locks were replaced by new Series 80 deadbolt locks to be operated and maintained by SCDC employees. Plaintiff alleges that a operating memorandum was also issued at that time which mandated that all cell doors should be locked at all times. However, Plaintiff alleges that SCDC employees regularly violated the mandates of this memorandum (called "Post Orders") by leaving cell doors unlocked, which became the daily routine, custom and practice at the prison. Plaintiff alleges that on September 12, 2007 he filed a grievance (MCI No. 801-07) expressing his concern over his safety with regard to unlocked

---

[1]The remaining Defendants in this case are Leroy Cartledge, Scott Lewis, and Officers "John/Jane Doe".

[2]This case was automatically referred to the undersigned United States Magistrate Judge for all pretrial proceedings pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Rule 73.02(B)(2)(d), D.S.C. The parties have filed motions for summary judgment. As these are dispositive motions, this Report and Recommendation is entered for review by the Court.



cell doors, but that the Defendants denied his grievance in a final response issued May 21, 2008, while declining to take any corrective action.

Plaintiff alleges that in November 2010, he was housed in the F-3 dormitory, where he was in a "dangerous and unlivable situation with his cell mate". Plaintiff alleges that he requested a transfer to a different cell, but that the MCI Institutional Classification Committee (ICC) denied his request. Plaintiff alleges that he thereafter wrote to the Director of Security of the SCDC (Colie Rushton) on November 1, 2010 giving Rushton legal notice of his dangerous condition and requesting a security move to a new cell. Plaintiff alleges this resulted in his being placed in the Special Management Unit (SMU) several days later. Plaintiff alleges he was thereafter released from the SMU approximately three weeks later and placed in the F-4 dormitory, but that upon arriving at the F-4 dormitory Plaintiff "felt that it was more violent than his previous dormitory and feared for his safety". Plaintiff alleges that he therefore went back to the ICC and requested to be moved back to the F-3 dormitory but was informed that, since he had recently been relocated, he had to wait one year before requesting another move.

Plaintiff alleges that on April 12, 2012, he went before the ICC again requesting to be moved back to the F-3 dormitory, and that this time the ICC approved his request. However, when Plaintiff had still not been moved back to F-3 several weeks later, he asked his classification worker (a "Ms. McNair") about the status of his move, and was told that Lt. Aiken[3] did not want Plaintiff to be moved back to her dormitory. Plaintiff alleges that he wrote no less than twenty (20) letters to the "Defendants" and to agency headquarters regarding his move, but although he was informed that he was on a list to be moved, he remained in the F-4 dormitory. Plaintiff further

---

[3]Although previously named as a Defendant, Aiken was one of the named Defendants dismissed as a party Defendant in the stipulation of dismissal filed January 12, 2016.

3



alleges that he personally spoke with Aiken regarding his approved move, but that she told him she did not want Plaintiff back in her dorm because Plaintiff "wrote her up too often". Plaintiff alleges he filed a grievance complaining that Aiken was retaliating against him, following which the Defendant Cartledge initiated a meeting between him and Aiken regarding this grievance. However, Plaintiff alleges that no corrective action was taken by Cartledge, and he remained in the F-4 dormitory.

Plaintiff alleges that on July 4, 2012, his cell door was left unlocked and unsecured after the 6:00 p.m. count by unknown correctional officers in violation of SCDC policy. Plaintiff alleges that sometime thereafter, two other inmates entered Plaintiff's cell while a third inmate remained outside the cell door barring his exit. Plaintiff alleges that the two inmates who entered his cell (Autigo McFadden and Carter Rondell) then proceeded to verbally assault and threaten him while demanding that Plaintiff relinquish his personal property. Plaintiff alleges that when he refused, he was attacked and brutally beaten and stabbed by McFadden and Rondell, following which the three inmates departed without removing any of Plaintiff's personal belongings. Plaintiff alleges he was suffering from grievous injuries and bleeding visibly, and that after securing his property in his locker he made his way to the F-4 dormitory officer desk, where he sought the help of Officer Harris.[4]  Plaintiff alleges that Harris took him to the MCI infirmary, but failed to lock Plaintiff's cell upon his departure.

Plaintiff alleges that upon arrival at the infirmary, MCI medical personnel called an ambulance, and he was transported to the emergency room at Regional Health Care Hospital, where he had to undergo surgery for his injuries. Plaintiff alleges he was admitted to the intensive care unit

---

[4]Harris was also a previously named Defendant who was dismissed as a party Defendant in the stipulation of dismissal filed January 12, 2016.



(ICU), and spent four (4) days in the hospital. Plaintiff alleges that when he was discharged from the hospital on January 8, 2012, it was with instructions for him not to be placed back in the general prison population for at least one week. However, Plaintiff alleges that on July 9, 2012, he was transferred from the MCI infirmary to the Lieber Correctional Institution (LCI) in direct contradiction of the hospital's discharge instructions. Further, Plaintiff alleges that upon returning to his cell at the F-4 dormitory to retrieve his personal belongings, he discovered that his locker had been broken into and that all of his personal belongings had been stolen.

In his **First Cause of Action** Plaintiff alleges that his rights under the Eighth Amendment were violated because the "Defendants" displayed deliberate indifference to Plaintiff's safety and security. Plaintiff alleges that the Defendants "were responsible for the training, instruction, supervision, evaluation, accreditation, inspection, discipline, control, and job performance of their employees, agents, and contractors" and that they violated his constitutional rights by failing to enforce their own rules and regulations and by failing to ensure his safety and security, and by allowing a routine, custom and practice to exist that resulted in him being placed at a greater risk of physical attack and by failing to isolate inmates who are gang members or prone to violence. In his **Second Cause of Action**, Plaintiff alleges the "Defendants" violated his rights under the Fourteenth Amendment when they failed to transfer him back to the F-3 dormitory after approval by the ICC and by failing to correct Aiken's retaliation against him for filing institutional grievances, thereby exposing him to unreasonable fear of attack by other inmates and knowingly facilitating, fostering and supporting a culture of deliberate indifference with lax oversight and no adherence to agency policies, procedures and post orders. Plaintiff seeks monetary damages. See generally, Plaintiff's Amended Complaint.

In support of his claim, Plaintiff has submitted as an exhibit a copy of the



memorandum of August 2007, which is from the Defendant Lewis on behalf of the Defendant Cartledge and addressed to all MCI correctional personnel.  This memorandum provides, inter alia, that once the new Series 80 locks have been installed and inmate keys retrieved, that inmate room doors are to be locked "at all times", whether the inmate is in his cell or not, with a general rule being that room doors are to be opened only at an inmate's request once an hour on the hour.  See Plaintiff's Exhibit (Court Docket No. 63-15, p. 20).

Both sides have also submitted numerous deposition excerpts in support of their motions for summary judgment.  Former Defendant Robert Ward, Deputy Director of Operations of SCDC, testified at his deposition[5] that the decision to go to the Series 80 deadbolt was to "stop inmates from destructing doors [by] finally putting safer locks on at our institutions that had cells".  Ward Deposition, p. 28.  Ward testified that the previous lock system "could be easily defeated by knowledgeable inmates with inmate ID cards, pieces of plastic, pieces of metal, and would even alter the inmate key in such a way that it would cause the tumblers to fall as if a master key or the key the officer carried was put into the cylinder".  Id., p. 29.  Ward testified that after the installation of the new locking system, the cell locking procedure set forth in the memorandum from 2007 was put into place, and when Ward was asked if that procedure was still in effect at MCI when Plaintiff was attacked on July 4, 2012, Ward answered "yes, sir".  Id., p. 32.  However, Ward also testified that the procedures set forth in the 2007 memorandum was not a "policy".  Id., p. 47.  See also Plaintiff's Exhibit 2 to Ward Deposition [Memorandum dated August 20, 2007 setting forth procedures for opening inmate rooms]; Plaintiff's Exhibit 3 to Ward Deposition [Email from Robert Ward instructing that doors should remain locked].

---

[5]Some of Ward's deposition excerpts were filed with the Court as part of Ward's now moot motion for summary judgment.



The Defendant Leroy Cartledge testified that the previous lock system, where each individual inmate had a key to their cell, was discontinued because it was easy for inmates to use an ID card and "shimmy it" and unlock a door. Cartledge Deposition, pp. 33-34. With respect to the memorandum Plaintiff references from 2007, Cartledge testified that the procedure outlined in that memorandum was not agency "policy". Id., pp. 42-43, 107. Rather, Cartledge testified that the procedures set out in that memorandum (following installation of the new door locks) were only in place for three to four months before MCI decided to go back to putting some of the responsibility on the inmate by implementing a system where cells were locked from roughly 9 p.m. to breakfast time, and were then unlocked during the day unless an inmate requested that his room be locked. Cartledge Deposition, p. 49. Cartledge testified that the new system they put into effect after the installation of the deadbolt locks "where cells were unlocked from breakfast until 9:00 p.m. unless otherwise requested by the inmate" was more effective as it maintained the inmates' freedom of movement but also allowed them to have their cells locked when they wanted, whereas the "other lock was so easy to defeat". Id., p. 51. Cartledge testified that the policy implemented provided that if the inmate wanted his door locked, the inmate would go stand by his door and let the officer lock the door for him. Id., pp. 41-42. Cartledge testified that this was the policy in place in the medium security dorms, where Plaintiff was housed, at the time of the attack on July 4, 2012. Id., pp. 29-30.

When Cartledge was asked if he was aware of any difference between the number of attacks between the F3 and F4 Units, he responded "no, sir". Id., p. 74. Although Plaintiff contends that F4 was more violent, Cartledge testified that "you could walk out that backdoor right now, and we could talk to ten inmates, and they will have ten different opinion[s] about those housing unit[s]". Id., p. 75. Cartledge further attests that an inmate who lived on the "B side of the dorm (F4-B) was not supposed to go from the B side to the A side (F4-A) unless they are escorted



by a correctional officer to the other side. Id., p. 77. Cartledge testified that at the time of the attack, McFadden and Carter were A side inmates, while Plaintiff was a B side inmate, and that to go from A side to B side or B side to A side, an inmate would have to go through a locked door, across the sally port, and then get through another locked door. Id., p. 79. However, Cartledge also acknowledged that when inmates return back to the dorm from breakfast in the morning, there is just one correctional officer in the dorm, and that correctional officer is going to be on their side making sure the inmates come back in, so if an inmate that lived on the A side went to the B side, there would be no way at that moment for the correctional officer to know that the inmate is not supposed to be over there until they start doing their checking locking the doors. Id., pp. 79-80. Cartledge also testified that one way an A sider could get to the B side or vice versa would be if a group of inmates was coming back from some place and they get in the wrong line and sneak into that area. Id., p. 81. Cartledge testified that at the time Plaintiff was attacked, McFadden and Carter were not supposed to be on B side and they were therefore out of place. Id., p. 94.

The Defendant Scott Lewis testified that it was up to the officials at MCI to come up with some guidelines about how to implement the new locking system, and that following conversations among the upper administration at MCI they came up with a policy of how to implement the new security system at MCI. Lewis Deposition, pp. 11, 13. Lewis discussed how the original lock cell system set forth in the 2007 memo did not work because of the number of inmates and that the correctional officers just did not have time to keep going individually to cell doors when inmates wanted to enter and exit. Id., p. 18. While Lewis conceded that there is a higher risk to employees and inmates when they are outside of a locked cell than when they are inside of a locked cell, when asked if he had noticed any increase or decrease in violent attacks within cells after they went to the new Series 80 locks, Lewis testified that he did not recollect it



being any more one way than the other. Id., pp. 21, 25.

Former Defendant Phillis Harris testified at her deposition that she started work with the SCDC in August 2011. Harris Deposition, p. 3. Harris testified that on July 4, 2012 she arrived at work at approximately 8:00 p.m., and that when she did her check after arriving at work, she had to unlock the door to get from A wing to B wing, and that following her check she locked the door back, so there was no way Plaintiff's attackers from the A side could have gotten onto the B side on her watch. Id., pp. 16, 25. Harris testified that she learned that Plaintiff had been stabbed approximately fifteen minutes after she arrived. Id., p. 16. Harris testified that she was about to do her report following completion of her security check when she saw Plaintiff coming down the hall. Id., p. 18. Harris testified that Plaintiff was bleeding and in distress, and she immediately called first responders to get him to medical. Id., p. 19. Dr. Luciano Fiszer testified that when Plaintiff was brought into the ER he was suffering from bite marks, lacerations and stab wounds. Plaintiff underwent a right chest tube placement and had blood drained. Fiszer Affidavit, pp. 7-8.

For his part, Plaintiff testified that he is currently incarcerated for assault and battery with intent to kill and kidnapping. Plaintiff's Deposition, p. 13. Plaintiff has also been charged with and convicted of escape since his incarceration. Id., pp. 15-16. Plaintiff further conceded that he had two disciplinary convictions in December 2011. Id., p. 82. Plaintiff testified that he was housed at MCI on the A Wing of Unit F4, and that after the change in the lock system, "the locks were taken off the doors, and [  ] the doors were left open so that you were subject to attack or loss of personal property". Id., p. 27. Plaintiff testified that he filed a grievance about the slack security and also complained to the Defendant Lewis about it. Id., pp. 27, 33. Plaintiff also testified about the August 2007 memo, said that it was posted in the dorms, and that to the best of his knowledge the locking procedure set forth in the August 2007 memorandum was supposed to have still been in effect in



July 2012.  Id., pp. 33, 44.  However, Plaintiff testified that the "no lock" system that was instead implemented by the Defendants was dangerous and put the inmates at risk because the officers would sit out in the sally port, leaving the inmates to pretty much have the run of the unit, a fact well known to the Defendants.  Plaintiff testified that there was no supervision provided, with the cell doors being wide open to all of the rooms.  Id., p. 57.

Plaintiff testified that while he was at MCI, there were more gang members in F-4, "more robbing, more raping, more people walking around with knives".  Id., p. 57.  Plaintiff testified that was why he wanted to get back over to F-3, where he "knew people and [   ] would be away from that somewhat", and that the only reason he was not allowed to move back there was because Lt. Aiken did not want him there.  Id., p. 57.  Plaintiff testified that he therefore continued to be housed on F4, and that on July 4, 2012, after the count had cleared, an officer "Norman" unlocked his cell door, following which McFadden and Carter came into his cell.  Carter had an icepick, while McFadden had a knife.  Id., p. 89.  Plaintiff testified that they demanded his "stuff", he refused, and a fight ensued in which he was stabbed several times.  Id., p. 90.  Plaintiff testified that when Carter and McFadden had entered his room, another inmate (known by the name "Cowboy") had barred the door so he could not get out.  Id., p. 91.  Plaintiff testified that following the attack, he went to find Harris, who was at her desk inside the Unit writing in the log book.  Plaintiff testified that as soon as Harris saw him, she started calling the first responders.  Id., p. 103.  Plaintiff testified that as a result of this assault, he had to have surgery and is now on medications.  Id., pp. 133-135.

Plaintiff did acknowledge, however, that prior to July 4, 2012, he had never been threatened by any particular inmates nor was there any specific individual that he had concerns about.  Plaintiff also testified that he had never been in any type of argument or disagreement with any specific inmate in F-4 prior to July 4, 2012, nor had he had any type of physical altercation or



verbal altercation with any inmate in F-4.  Id., pp. 82-83.  Plaintiff also testified that prior to the incident of July 4, 2012, he did not know either McFadden or Carter, and when asked if he had any specific reason to be afraid of either one of those two individuals prior to July 4, 2012, Plaintiff responded "not until they came in my room with knives".  Id., pp. 83-84.  Plaintiff further acknowledged that neither Cartledge nor Lewis were present at MCI on July 4, 2012, when the incident occurred.  Id., pp. 115.  Nonetheless,  Plaintiff testified that Cartledge violated his constitutional rights by failing to comply with the August 2007 memorandum instructing that cell doors were to remain locked, and by approving and condoning his correctional officers not complying with this directive even though he knew that violence was taking place in the Unit because "every violent incident report in that institution went across his desk".  Id., pp. 119-120. Plaintiff also testified his rights were violated when Cartledge refused to move him back to F-3 even after his transfer had been approved.  Id., pp. 121-122.  Plaintiff testified that Lewis is liable for these same reasons.  Id., p. 123.

Plaintiff has also submitted an exhibit showing the number of assaults and contraband (weapons) violations at MCI for various years dating back to 2005; see Plaintiff's Exhibit 1; as well as deposition excerpts from fellow inmates talking about how the cell security system at MCI put inmates at risk.  Inmate Philip Brown testified that after the new deadbolt security system was implemented he had to nap with "one eye open" because the cell doors were not locked and inmates could come in and out of your cell at any time.  Brown Deposition, pp. 78-79.  Brown also generally testified about how dangerous it was at MCI, with searches routinely turning up weapons that were seized from inmates.  Brown testified that on July 4, 2012, inmates were supposed to be let out of their rooms for recreation following which the guards were supposed to come back and lock the cell doors, but that "McCormick wasn't doing it".  Id., pp. 38-39.  Brown testified that they should have



been locking or unlocking doors to let inmates in and out every thirty minutes or every hour, but that the guards were "lazy" and the guards were just letting the cell doors stay open.  Id., pp. 39-41. Brown testified that the guards "just stopped locking the doors" because it was too much work for them to keep coming back and forth to lock and unlock the doors.  Id., p. 43.

Inmate Carroll Mace  testified that there was a dangerous atmosphere at MCI, describing it as a "gladiator situation".  Mace Deposition, p. 45.  Inmate Dean Mattox testified that certain officers at MCI would let "the door swing" and that "when they do that, it is on".  Mattox Deposition, p. 42.  Mattox testified that he personally witnessed robberies, thefts, and stabbings. Id., pp. 47-48.  Another inmate, Leon Woodford, also testified that there was a lot of gang activity at MCI and that the inmates felt that they were at risk.  Woodford Deposition, p. 14.

Inmate Jessie Edmond testified that Plaintiff had expressed to him that he felt like he was the target of retaliation by Aiken, although he did not have any other information on that issue.  Edmond Deposition, p. 30.  Edmond also testified that if he filed a grievance, you were "vigorously harassed, vigorously punished and retaliated against.  Id., p. 126.  Edmond testified that on July 4, 2012 he did not specifically recall how many officers were in F-4, but that there was no officer on the wing when Plaintiff was attacked.  Edmond testified that the officer was "out in the make shift break area called Room 108".  Id., p. 49.  Edmond testified that within thirty minutes of the count having been cleared (sometime after six p.m.) he stepped out of his cell and noticed some people loitering down towards where Plaintiff's cell door was located.  Id., p. 50.  Edmond testified that he had heard other people complain to Cartledge and Lewis about how the lock system was not working, and that everyone was "scared crapless".  Id., p. 82.  Edmond also testified that he had spoken with Cartledge about gang activity and how gang members had access to people in their cells and were threatening both Edmond and other with "knives and stuff".  Id., pp. 94-95.  Edmond

12



testified that the officer (unnamed) would permit inmates to travel between the A side and the B side "fairly easily and readily". Id., pp. 141-142; see also, generally, Bullock Deposition, Carter Deposition.

Colie Rushton was the Warden at MCI in February 2007, he was subsequently replaced by Cartledge. Ward Deposition, p. 26. Rushton testified that MCI is one of the better Level III prisons in the state compared to any of the other Level III's, but that "things happen at all prisons". He did not consider MCI to be any more violent or less violent as compared to the other institutions in the state. Rushton Deposition, p. 71.

**Discussion**

As noted, both sides have moved for summary judgment on Plaintiff's claims. Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Rule 56, Fed.R.Civ.P. The moving party has the burden of proving that judgment on the pleadings is appropriate. Temkin v. Frederick County Comm'rs, 945 F.2d 716, 718 (4th Cir. 1991). Once the moving party makes this showing, however, the opposing party must respond to the motion with specific facts showing there is a genuine issue for trial. Baber v. Hosp. Corp. of Am., 977 F.2d 872, 874-75 (4th Cir. 1992).

**I.**

Initially, with respect to the "John Doe/Jane Doe" Defendants named in the caption of the Complaint, these individuals have never been identified or served with process. As such, since almost two years have now passed since the filing of this case, these unidentified Defendants should be dismissed without prejudice from the caption of the Complaint. See Rule 4(m),



Fed.R.Civ.P. <u>Cf</u>. <u>Davison v. Kennedy</u>, No. 15-1373, 2016 WL 538906, at * 7 (M.D.Pa. Feb. 11, 2016) [Dismissing John Doe defendants whom Plaintiff had failed to identify and serve within one hundred twenty days].[6]

**II.**

As employees of the State of South Carolina, both of the remaining Defendants, Cartledge and Lewis, are subject to suit for damages under § 1983 in their individual capacities. Even so, it is readily apparent that  both Cartledge and Lewis hold administrative/supervisory positions at MCI, and the doctrines of vicarious liability and respondeat superior are not applicable in § 1983 cases. <u>Vinnedge v. Gibbs</u>, 550 F.2d 926, 927-929 & nn. 1-2 (4th Cir. 1977). Therefore, in order for either of these Defendants to be liable in this case, Plaintiff must have evidence to show that they had "personal knowledge of and involvement in the alleged deprivation of [Plaintiff's] rights", or were themselves responsible for an official policy or custom which resulted in illegal action. <u>Harveck v. Smith,</u> 814 F.Supp.2d 608, 627 (E.D.Va. 2011), citing <u>Wright v. Collins</u>, 766 F.2d 841, 850 (4th Cir. 1985); <u>Barren v. Harrington</u>, 152 F.3d 1193, 1194 (9th Cir. 1999) ["Liability . . . must be based on the personal involvement of the Defendant"], <u>cert</u>. <u>denied</u>, 522 U.S. 1154 (1999); <u>see</u> <u>also</u> <u>Horton v. Marovich</u>, 925 F.Supp. 540 (N.D.Ill. 1996) ["Thus, a plaintiff suing a government official in his individual capacity and therefore seeking to hold the official personally liable must show that the official personally caused or played a role in causing the depravation of a federal right"]; <u>See</u> <u>generally</u>, <u>Monell v. Dep't of Social Servs.</u>, 436 U.S. 658, 694 (1978); <u>Wetherington v. Phillips</u>, 380 F.Supp. 426, 428-429 (E.D.N.C. 1974), <u>aff'd</u>, 526 F.2d 591 (4th Cir.

---

[6]While Rule 4(m) was amended on December 1, 2015 to reduce the period for effecting service on a defendant to ninety days, since this case was already pending prior to that time, the earlier one hundred twenty day time period for effecting service was applicable. <u>See</u> Order filed November 23, 2915 in 3:15-mc-0376-TLW.



1975); <u>Joyner v. Abbott Laboratories</u>, 674 F.Supp. 185, 191 (E.D.N.C. 1987); <u>Stubb v. Hunter</u>, 806 F.Supp. 81, 82-83 (D.S.C. 1992); <u>See</u> <u>Slakan v. Porter</u>, 737 F.2d 368, 375-376 (4th Cir. 1984), <u>cert.</u> <u>denied</u>, <u>Reed v. Slakan</u>, 470 U.S. 1035 (1985); <u>Shaw v. Stroud</u>, 13 F.3d 791, 799 (4th Cir. 1994), <u>cert. denied</u>, 115 S.Ct. 67 (1994); <u>Fisher v. Washington Metro Area Transit Authority</u>, 690 F.2d 1133, 1142-1143 (4th Cir. 1982) (citing <u>Hall v. Tawney</u>, 621 F.2d 607 (4th Cir. 1980)).

After careful review and consideration of the arguments and evidence presented, the undersigned concludes that a genuine issue of fact has been presented as to whether Cartledge and Lewis violated Plaintiff's constitutional rights pursuant to this standard. Therefore, neither Plaintiff nor the Defendants are entitled to summary judgment in this case.

In order to proceed on a failure to protect claim, the evidence must be sufficient to give rise to a genuine issue of fact as to whether any named Defendant was deliberately indifferent to a specific known risk of harm to the Plaintiff. <u>See</u> <u>Pruitt v. Moore</u>, No. 02-395, 2003 WL 23851094, at * 9 (D.S.C. Jul. 7, 2003)[Deliberate or callous indifference on the part of prison officials to a specific known risk of harm states an Eighth Amendment claim], <u>cert</u>. <u>denied</u>, 2004 WL 232748 (4th Cir. 2004); <u>Levy v. State of Ill. Dept. of Corrections</u>, No. 96-4705, 1997 WL 112833 (N.D.Ill. Mar. 11, 1997) ["A defendant acts with deliberate indifference . . . if he or she 'knows of and disregards' an excessive risk to inmate health or safety]. The Defendant against whom the claim is being asserted "must have both been aware of facts from which the inference could be drawn that a substantial risk of serious harm existed, and . . . [they] must have also drawn that inference". <u>Farmer v. Brennan</u>, 511 U.S. 825, 837 (1994).

The Supreme Court has held that a plaintiff can make out a <u>prima</u> <u>facie</u> case of deliberate indifference by showing "that a substantial risk of [serious harm] was long standing, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances



suggest that the defendant-official being sued had been exposed to information concerning the risk and thus 'must have known' about it". <u>Farmer</u>, 511 U. S. at 842. However, this "deliberate indifference" standard is a "very high standard - a showing of mere negligence will not meet it". <u>Grayson v. Peed</u>, 195 F.3d 692, 695 (4th Cir. 1999); <u>see</u> <u>also</u> <u>A.P. ex rel. Bazerman v. Feaver</u>, No. 04-15645, 2008 WL 3870697 at *12 (11th Cir. Aug. 21, 2008)["[D]eliberate indifference requires a much higher standard of fault than mere or even gross negligence . . . ."]; <u>Danser v. Stanberry</u>, 777 F.3d 340, 346-347 (4th Cir. 2014)[Plaintiff must "establish a serious deprivation of his rights in the form of a serious or significant physical or emotional injury[7] and "that the prison official allegedly violating [P]laintiff's constitutional rights had a sufficiently culpable state of mind"] (internal citation omitted) [vacating district court's order denying summary judgment and remanding with instructions to enter summary judgment].

Based on the evidence presented, there is a genuine issue of fact as to whether the Defendants Cartledge and Lewis approved a policy that they knew subjected inmates to greater risk of intimidation and assault, thereby allowing an environment of violence and intimidation to occur and subjecting Plaintiff to an excessive risk to his health or safety. <u>Levy</u>, 1997 WL 112833 ["A defendant acts with deliberate indifference . . . if he or she 'knows of and disregards' an excessive risk to inmate health or safety]. The evidence shows that, contrary to original instructions issued when the new locking system was put in place in 2007 (stating that inmate cells should be locked at all times), Cartledge and Lewis both knew of and allowed a system to be put in place where inmate cells were unlocked during the course of the day with minimal supervision or oversight, thereby allowing prison inmates unfettered access to other inmate's cells, through which a culture

---

[7]Defendants have not contested the evidence showing that Plaintiff incurred serious physical injuries a result of the inmate attack.

16



of gang violence and control was able to be imposed on the inmate population.[8]  Plaintiff has submitted evidence from other inmates to show that the implementation of the "no-lock" system by the Defendants had created a very dangerous atmosphere for inmates, and that both Defendants knew of the inmates' fears and complaints about how vulnerable the system had made them to attack, violence and extortion.  Plaintiff further testified that he had personally complained to both Cartledge and Lewis about this situation and the danger it posed to inmates such as himself, but that neither Defendant took any corrective action.

Considered in the light most favorable to the Plaintiff, this evidence is sufficient to deny summary judgment to the Defendants on this claim.  See Farmer, 511 U.S. at 842 [Deliberate indifference can be demonstrated by evidence showing "that a substantial risk of [serious harm] was long standing, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus 'must have known' about it"]; Shaw v. Stroud, 13 F.2d 791, 799 (4th Cir. 1994) [to establish supervisory liability under § 1983, evidence must show that the supervisor

---

[8]As stated, the question presented in this case is whether this policy and practice, implemented by the Defendants and followed by the prison guards at MCI, amounted to or resulted in a violation of Plaintiff's constitutional rights.  Whether, in doing so, the Defendants also violated a "policy" of the SCDC is not determinative, as even assuming Plaintiff's allegation that the 2007 memo represented a "policy" of the SCDC with respect to the locking of cell doors, and that the Defendants violated that policy, to be true for purposes of summary judgment, that would not by itself establish a violation of Plaintiff's constitutional rights.  Keeler v. Pea, 782 F.Supp. 42, 44 (D.S.C. 1992) [violations of prison policies which fail to reach the level of a constitutional violation are not actionable under § 1983]); see also Scott v. Hamidullah, No. 05-3027, 2007 WL 904803 *5 n.6 (D.S.C. Mar. 21, 2007) (citing Riccio v. County of Fairfax, Virginia, 907 F.2d 1459, 1469 (4th Cir. 1990)); Johnson v. S.C. Dep't of Corrections, No. 06-2062, 2007 WL 904826 at *12 (D.S.C. Mar. 21, 2007) ["Plaintiff's allegation that Defendants did not follow their own policies fails, as the failure of prison officials to follow their own policies or procedures, standing alone, does not amount to a constitutional violation."] (citing Riccio, 907 F.2d at 1469 [if state law grants more procedural rights than the Constitution requires, a state's failure to abide by that law is not a federal due process issue]).

17



had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to the plaintiff, the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or authorization of the alleged offensive practice, and there is an affirmative causal link between the supervisor's inaction and the particular constitutional injuries suffered by the plaintiff]; see Gray v. Spillman, 924 F.2d 90, 95 (4th Cir. 1991) [When considering whether summary judgment is appropriate, the Court must assume that the version of facts presented in opposition to summary judgment to be true].

Even so, the evidence (considered in the light most favorable to the Defendants) is also sufficient to deny summary judgment to the Plaintiff on this claim. Plaintiff himself acknowledged during his deposition that he had not been personally threatened or subjected to an assault prior to the incident of July 4, 2012, nor had he advised either Defendant of any personal threats that had been made against him. Therefore, there is a genuine issue of fact, at least for purposes of summary judgment, as to whether the Defendants were aware of specific facts from which an inference could be drawn that Plaintiff was subject to a substantial risk of serious harm. Farmer, 511 U.S. at 837[Defendant must have both been aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also have drawn that inference"]; see also Feaver, 2008 WL 3870697 at *12 ["[D]eliberate indifference requires a much higher standard of fault than mere or even gross negligence . . . ."]. Prisons are dangerous places where violent acts unfortunately frequently occur, and the Defendants are not subject to liability for violating Plaintiff's constitutional rights just because he was the victim of an act of violence. Rather, Plaintiff must show some culpability on the part of the Defendants. Cf. Carter v. Galloway, 32 F.3d 1346, 1349-1350 (11th Cir. 2003) [Affirming summary judgment where Defendants knew that inmate who attacked Plaintiff was a problem inmate with a disobedience history and had been



prone to violence, but Plaintiff had failed to establish the Defendants had a subjective awareness of a substantial risk of serious physical threat to the Plaintiff]; see also Drayton v. Cohen, No. 10-3171, 2012 WL 666839 at * 7 (D.S.C. Feb. 29, 2012) [granting summary judgment on a failure to protect claim], aff'd, 474 Fed.App'x. 991 (4th cir. Aug. 6, 2012).

In sum, while Plaintiff has presented evidence sufficient to create an inference that the Defendants were aware of the dangerous conditions that had been created at the prison by virtue of their policies and customs relating to cell access and freedom of movement, thereby resulting in a dangerous situation to the Plaintiff which ultimately lead to his being assaulted, the Defendants have submitted evidence to show that the policy at issue was designed to afford freedom of movement by inmates in the general population while also allowing for inmates to lock their cells when they chose or needed to do so, and that they had no prior notice that Plaintiff was in danger or would be subjected to attack prior to the incident occurring. See United States v. Stotts, 925 F.2d 83, 86 (4th Cir. 1991) [Courts should afford a deferential standard of review to the decisions of prison administrators who are tasked with making the difficult judgments concerning institutional operations]. Therefore, neither Plaintiff nor the Defendants are entitled to summary judgment on Plaintiff's failure to protect claim as set forth in the First and Second Causes of Action of his Amended Complaint. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)["Credibility determinations, the weighing of evidence, and drawing of legitimate inferences from the facts" are functions for the trier of fact]; Muhammad v. Klotz, 36 F.Supp.2d 240, 243 (E.D.Pa. 1999)["Thus, at the summary judgment stage the only inquiry is the threshold one of determining whether there is the need for a trial, that is, 'whether the evidence presents a sufficient disagreement to require submission to [the trier of fact] or whether it is so one-sided that one party must prevail as a matter



of law.'"].[9]

## III.

Finally, the undersigned does not find that the Defendants Cartledge or Lewis are entitled to qualified immunity with respect to Plaintiff's failure to protect claim, as it was certainly clearly established during the time period at issue that even supervisory personnel can be subject to liability for having either direct knowledge of, or having created a policy or practice exercised by their subordinates, sufficient to create a situation from which an inference could be drawn that a substantial risk of harm existed and being deliberately or callously indifferent to that substantial risk of serious harm.  See Pruitt, 2003 WL 23851094, at * 9 [Deliberate or callous indifference on the part of prison officials to a specific known risk of harm states an Eighth Amendment claim], cert. denied, 2004 WL 232748 (4th Cir. 2004); Levy, 1997 WL 112833  ["A defendant acts with deliberate indifference . . . if he or she 'knows of and disregards' an excessive risk to inmate health or safety].

---

[9]However, to the extent Plaintiff has intended to assert a separate claim for retaliation, the Defendants are entitled to summary judgment on any such claim, as there is simply no evidence to support this conclusory and self serving allegation.  See Atkinson v. Bohn, 91 F.3d 1127, 1129 (8th Cir. 1996) (per curiam) [speculative and conclusory allegations cannot support retaliation claim]; LaCroix v. Williams, No. 97-0790, 2000 WL 1375737 at *4 (W.D.N.Y. Sept. 21, 2000) ["Plaintiff's conclusory allegations aside, there is simply nothing in the record to support his version of the facts and plaintiff's claim for retaliation fails"].  None of the deposition transcripts provided to the Court constitutes evidence to support Plaintiff's claim that his failure to be moved from one dorm to another dorm was in retaliation for Plaintiff having filed grievances or civil lawsuit.  Rather, Plaintiff only conclusorily speculates that this was the case. Therefore, to the extent Plaintiff has intended to assert a separate retaliation claim in this lawsuit, it should be dismissed.  Wright v. Vitall, No. 91-7539, 1991 WL 127597 at**1 (4th Cir. July 16, 1991) [Retaliation claim based on mere conclusory statements cannot withstand defendants' summary judgment motion]; Harris v. Ostrout, 65 F.3d 912, 916 (11th Cir. 1995)[case dismissed where Plaintiff produced nothing beyond his own conclusory allegations suggesting that prison official's actions were motivated by a retaliatory animus]; Woods v. Edwards, 51 F.3d 577, 580-581 (5th Cir. 1995) [summary judgment affirmed where inmate offered no evidence other than his personal belief that the alleged retaliatory actions were based on his exercise of his rights].



Plaintiff's evidence is sufficient to create a genuine issue of fact as to whether such a situation existed in this case. Therefore, the Defendants are not entitled to dismissal of this claim on the basis of qualified immunity, at least not at summary judgment. See Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)[Defendant entitled to qualified immunity only insofar as the conduct alleged did not violate clearly established statutory or constitutional rights of which a reasonable person should have know].

## Conclusion

Based on the foregoing, it is recommended that, to the extent Plaintiff has intended to assert a separate retaliation claim in this lawsuit, the Defendants' motion for summary judgment with respect to that claim should be granted, and that claim should be dismissed. However, for the reasons stated, both Plaintiff's and Defendants' motions for summary judgment with respect to Plaintiff's failure to protect claim should be denied.

The parties are referred to the Notice Page attached hereto.

 

_____
Bristow Marchant
United States Magistrate Judge

March 7, 2016
Charleston, South Carolina

21



**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
Post Office Box 835
Charleston, South Carolina 29402

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

